**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| **LAMAR RUTHERFORD,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.: 1:23-cv-00985** |
| | **JURY TRIAL DEMANDED** |
| **CGI FEDERAL, INC. and** | |
| **ASRC FEDERAL HOLDING** | |
| **COMPANY, LLC,** | |
| *Defendants*. | |

## COMPLAINT

Plaintiff Lamar Rutherford ("Plaintiff" or "Mr. Rutherford") complains against Defendants CGI Federal, Inc. ("CGI" or the "sub-contractor") and ASRC Federal Holding Company, LLC ("ASRC" or the "contractor" and collectively "Defendants"), and alleges as follows:

### NATURE OF CLAIMS

1.      Mr. Rutherford is a highly skilled software engineer and developer who has spent the past several years seeking justice for the egregious racial discrimination and retaliation that he faced while working for CGI (a sub-contractor for ASRC) and ASRC (a defense contractor for the federal government). Just over one month after Mr. Rutherford began working under a contract between ASRC and CGI, his direct supervisor, Chance Yohman ("Mr. Yohman"), an ASRC employee, referred to him using the most dehumanizing and offensive racial epithet used towards African Americans—a N*gger. During a regular morning meeting, Mr. Yohman, referred to Mr. Rutherford, the only Black employee in the room, as an "NWA," which stands for "n*gger with attitude." When Mr. Rutherford complained about Mr. Yohman's discriminatory language, Mr.

Yohman's targeting of Mr. Rutherford increased, and Mr. Yohman continued to use racially offensive language. Unfortunately, Defendants' discriminatory treatment of Mr. Rutherford was not limited to racial epithets. Defendants also treated Mr. Rutherford and other Black employees much worse than similarly situated white employees. Mr. Yohman humiliated Mr. Rutherford and created a hostile work environment based on race, issued false negative performance feedback about Mr. Rutherford to upper management, micromanaged Mr. Rutherford's work tasks, and intentionally set Mr. Rutherford up for failure by unjustifiably increasing Mr. Rutherford's workload and impeding Mr. Rutherford's ability to effectively perform his job.

2.     When Mr. Rutherford finally garnered the courage to submit an internal complaint, neither CGI nor ASRC took any action to remedy the harm. Mr. Rutherford therefore had no other recourse than to file a complaint with the United States Equal Employment Opportunity Commission ("EEOC"). After filing with the EEOC, ASRC immediately retaliated against Mr. Rutherford by issuing to him a notice that he was being removed him from the Contract, and CGI followed suit by giving him a two-week notice to find a new position or face termination from CGI. Though ASRC and CGI quickly rescinded the removal and termination notice, Mr. Rutherford faced significant emotional and professional harm by the discrimination and retaliation. When he returned to work at ASRC and CGI, he reported the discrimination and retaliation to the Ethics and Compliance Office at CGI. CGI stated that it would conduct an investigation. However, upon CGI's learning that Mr. Rutherford had filed a charge with the EEOC, the "investigation" quickly concluded, finding no unlawful discrimination or retaliation and no violation of internal policy. Mr. Rutherford was devastated. He had faced months of race-based discrimination and harassment, including the most demoralizing racial slur, and yet neither of his employers offered him any protection, empathy, or recourse.

3.     Mr. Rutherford, by and through his undersigned counsel, alleges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Mr. Rutherford seeks declaratory relief, injunctive relief, compensatory damages, punitive damages, interest, attorneys' fees, and costs.

**PARTIES**

**<u>*Lamar Rutherford*</u>**

4.     Mr. Rutherford began working for CGI on or about August 31, 2015, as a Developer. Most recently, Mr. Rutherford worked for CGI under the title of Application Engineer.

5.     On or about October 17, 2016, after being interviewed by ASRC, Mr. Rutherford began working under a contract with ASRC as the prime contractor and CGI as the sub-contractor.

6.     Mr. Rutherford resides in Fairfax County, Virginia.

7.     Throughout his employment with CGI and ASRC, Mr. Rutherford worked at the ASRC Federal DNC worksite located at 1851 Alexander Bell Drive, Suite 200, Reston, Virginia, located within the Eastern District of Virginia.

**DEFENDANTS**

**<u>*CGI Federal*</u>**

8.     CGI Federal, Inc. is a stock corporation formed under the laws of the State of Delaware, with its principal place of business in Virginia. CGI Federal, Inc. is a wholly owned subsidiary of CGI, Inc., a Canadian corporation.

9.     CGI Federal, Inc. ("CGI") maintains its principal place of business at 12601 Fair Lakes Circle, Suite 500, Fairfax, VA, 22033, located in Fairfax County, Virginia, within the Eastern District of Virginia.

10.     Upon information and belief, CGI maintains control, oversight, and direction over the operation of its facilities, including its employment practices. Mr. Rutherford's paystubs reflect that CGI paid Mr. Rutherford for the work he performed under CGI's contract with ASRC.

11.     Since August 2015, CGI has been Mr. Rutherford's employer within the meaning of all applicable statutes.

### *ASRC Federal Holding Company, LLC*

12.     ASRC Federal Holding Company is a limited liability company formed under the laws of the State of Alaska, with its principal place of business in Maryland. ASRC Federal Holding Company, LLC is a wholly owned subsidiary of Arctic Slope Regional Corporation. ASRC Federal acquired Data Networks, Inc. ("DNC") as a subsidiary in or around November 2015. DNC is a stock corporation incorporated under the laws of the State of Virginia, with its principal place of business in Virginia.

13.     ASRC maintains its principal place of business at its co-headquarters, 7000 Muirkirk Meadows Drive, Suite 100, Beltsville, Maryland, 20705. ASRC has a second co-headquarters at 11091 Sunset Hills Road, Suite 800, Reston, Virginia 20190. DNC maintains its principal place of business at 1851 Alexander Bell Drive, Suite 200, Reston, Virginia, within the Eastern District of Virginia.

14.     Upon information and belief, ASRC maintains control, oversight, and direction over the operation of its facilities, including its employment practices. ASRC employed fully integrated subcontractors, including Plaintiff, at the DNC worksite in Reston, Virginia. ASRC controlled and provided the place of work, daily direction, supervision, and utilities for subcontractors, including Plaintiff.

15.     Since October 2016, ASRC has been Mr. Rutherford's employer, jointly with CGI, within the meaning of all applicable statutes.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts federal law claims under Title VII.

17.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343 because Plaintiff's claims under Title VII are brought to recover damages for deprivation of equal rights.

18.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)–(c) because Defendants conduct business and can be found in this District, a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District, and records relevant to Defendants' unlawful employment  practices are maintained and administered in this District.

19.     The Eastern District of Virginia has personal jurisdiction over Defendant CGI because CGI maintains its principal place of business in the District.

20.     The Eastern District of Virginia has specific jurisdiction over Defendant ASRC because ASRC, through its wholly owned subsidiary DNC, conducts business within this District and employs workers, including Mr. Rutherford, within this District. Plaintiff's claims arise from ASRC's relationship with its contacts in this District.

## ADMINISTRATIVE EXHAUSTION

21.     In April 2017, Plaintiff filed a charge of race-based discrimination, harassment, and retaliation against ASRC with the United States Equal Employment Opportunity Commission ("EEOC") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (EEOC Charge No. 570-2017-01259).

22.     In May 2017, Plaintiff filed a charge of race-based discrimination, harassment, and retaliation against CGI with the EEOC under Title VII (EEOC Charge No. 570-2017-01284).

23.     On August 8, 2017, Plaintiff filed charges of race-based discrimination, harassment, and retaliation with the Fairfax County Office of Human Rights and Equity Programs ("OHREP") under Chapter 11 of the Code of the County of Fairfax, Virginia (the "Fairfax County HRO") against both ASRC and CGI.

24.     On January 31, 2019, Plaintiff filed a charge of race-based discrimination and retaliation with the EEOC and OHREP against CGI (EEOC Charge No. 10D-2019-00040).

25.     On October 13, 2021, the OHREP found that ASRC was liable under the Fairfax County HRO as Plaintiff's joint employer for race-based harassment and retaliation.

26.     On February 16, 2022, the OHREP found that CGI was liable under the Fairfax County HRO as Plaintiff's joint employer for race-based retaliation.

27.     On May 2, 2023, the EEOC issued Mr. Rutherford a Notice of Right to Sue on Charge No. 10D-2019-00040. Mr. Rutherford has requested Notices of Right to Sue for Charges No. 570-2017-01259 and 570-2017-01284; Mr. Rutherford will amend this filing to include these notices once received.

28.     Mr. Rutherford has fully complied with all prerequisites to jurisdiction in this Court under Title VII.

## FACTUAL ALLEGATIONS

29.     Mr. Rutherford began working as a contractor for CGI on or about August 31, 2015, as a Developer. Mr. Rutherford's most recent title at CGI was Application Engineer.

30.     On or about October 17, 2016, Mr. Rutherford began working under the ASRC Federal DNC Defense Medical Information Exchange ("DMIX") contract (the "Contract"), with ASRC as the primary contractor and CGI as the sub-contractor. ASRC employed fully integrated subcontractors, including Mr. Rutherford, who reported directly to project leads employed by ASRC and worked at the ASRC Federal DNC worksite. Mr. Rutherford's paystubs reflect that

CGI paid his wages. Defendants CGI and ASRC jointly employed Mr. Rutherford during the relevant time period.

31.     While working for CGI and ASRC, Mr. Rutherford performed exceptionally. He received at least two performance reviews, and both reviews rated his performance positively. On several occasions during the Contract with ASRC, Mr. Rutherford also received feedback via email that ASRC felt he was a good employee who performed good work and added value to the company. Until Defendants began discriminating and retaliating against Mr. Rutherford, he had never received any negative performance feedback. His performance history was unblemished.

### Mr. Rutherford's Direct Supervisor Called Him a "N\*gger With Attitude"

32.     While working under the Contract, Mr. Rutherford reported directly to Chance Yohman (white), the lead Application Engineer on the ASRC DNC DMIX project and an ASRC employee. Mr. Yohman was responsible for overseeing the work and task assignments of other Application Engineers, including Mr. Rutherford.

33.     On or about November 17, 2016, Mr. Rutherford participated in a regular morning meeting with his team of about ten to twelve employees, including Mr. Yohman, Jonathan Hite (white), and Scott Moe (white). Mr. Rutherford was the only Black employee in the room.

34.     During this meeting, on or about November 17, 2016 – about one month after Mr. Rutherford began working for ASRC – in the most dehumanizing experience of Mr. Rutherford's life, Mr. Yohman referred to Mr. Rutherford as an "NWA" – a "n\*gger with attitude." Mr. Rutherford was horrified in disbelief. After the meeting, he asked Mr. Hite to confirm Mr. Yohman's racist obscenity. Mr. Hite confirmed that he had also heard Mr. Yohman call Mr. Rutherford an "NWA." Unfortunately, Mr. Yohman's dehumanizing language was the start of his long campaign of racial discrimination and retaliation against Mr. Rutherford.

**After Mr. Rutherford Reported Being Subjected to Racial Discrimination, CGI and ASRC Engaged in a Three- to Four-Month Campaign to Further Discriminate and Retaliate Against Him.**

33.     In or about late January or early February 2017, Mr. Rutherford verbally reported Mr. Yohman's discriminatory conduct, including Mr. Yohman's use of "NWA," to Scott Moe, Mr. Rutherford's team lead and an ASRC employee. Mr. Moe was also present at the November 17, 2016, meeting and witnessed Mr. Yohman call Mr. Rutherford an "NWA." In his interview with the OHREP, Mr. Moe confirmed that he heard Mr. Yohman say "NWA" and believed that Mr. Yohman may have been intentionally targeting Mr. Rutherford, who was the only Black employee in the meeting.

34.     After Mr. Rutherford reported the discrimination to Mr. Moe, Mr. Yohman's treatment of Mr. Rutherford worsened tenfold. Mr. Yohman embarked upon a three-to-four month campaign of discriminating and retaliating against Mr. Rutherford by: interrupting Mr. Rutherford and speaking on his behalf in meetings, interjecting in Mr. Rutherford's email communications, yelling at Mr. Rutherford in a hostile manner, micromanaging Mr. Rutherford, fabricating complaints to upper management about Mr. Rutherford's work ethic and performance, increasing Mr. Rutherford's workload without a legitimate business justification for doing so, excluding Mr. Rutherford from important  discussions relating to the projects Mr. Rutherford was working on, failing to provide Mr. Rutherford with direction or training as Mr. Rutherford's supervisor, and sharing his offensive, negative beliefs about Black people and other minorities. Mr. Yohman did not engage in these actions with Defendants' white employees. In so doing, Mr. Yohman created a racially discriminatory and retaliatory hostile work environment.

35.     With each day of work at CGI and ASRC, Mr. Rutherford became increasingly aware that Mr. Yohman treated Black people much worse than white people. For instance, on February 7, 2017, Mr. Rutherford witnessed Mr. Yohman interrupt and yell at another Black

subcontractor, HalDane Prince, during a meeting. While Mr. Prince was speaking, Mr. Yohman jumped out of his seat, knocked over a water tank, and yelled at Mr. Prince to "shut up and don't say another word." Mr. Rutherford had never witnessed Mr. Yohman treat or speak to any of Defendants' white employees this way.

36.     The next day, on February 8, 2017, Mr. Rutherford had a particularly unsettling conversation with Mr. Yohman about Mr. Yohman's racist beliefs and upbringing. Mr. Rutherford initiated the conversation by telling Mr. Yohman that his differential treatment, including interrupting him at meetings and micromanaging his work, had made him uncomfortable. Instead of apologizing for his racially motivated behavior, Mr. Yohman attempted to justify his behavior to Mr. Rutherford by explaining his long history of racist beliefs. Mr. Yohman informed Mr. Rutherford that he grew up in an all-white town without Black people or other racial minorities. Then, Mr. Yohman told Mr. Rutherford that he believed that Black people and other racial minorities were "taking jobs from white people." Mr. Yohman also stated that most of his friends shared these racist beliefs. This conversation only made Mr. Rutherford more uncomfortable and confirmed to him that Mr. Yohman was intentionally discriminating against him because he is Black.

37.     On February 9, 2017, Mr. Moe followed up with Mr. Rutherford via email. Mr. Moe checked in, asking Mr. Rutherford about his day-to-day experience at work, and noting his observation that Mr. Yohman had seemed stressed and "a little short" earlier in the week. On the same day, Mr. Rutherford responded to Mr. Moe's email and expressed additional concerns about Mr. Yohman's racist and discriminatory treatment towards him. Mr. Rutherford informed Mr. Moe that Mr. Yohman had usurped his turn to speak at their morning team meeting, and the entire team began speaking about Mr. Rutherford as if he were not there. Mr. Rutherford further informed Mr. Moe that Mr. Yohman allowed all the white employees to speak directly with the team during

these meetings, but he  did not let Mr. Rutherford, the sole black employee at the meeting, speak to the team on his own behalf.

38.     On February 28, 2017, Mr. Yohman expressed his satisfaction with Mr. Rutherford's performance. He emailed Mr. Rutherford, stating that Mr. Rutherford had done an excellent job communicating and working on his work tasks. Of course, Mr. Yohman could take no other position, as Mr. Rutherford's objectively positive performance spoke for itself. Unfortunately, despite this positive feedback, Mr. Yohman's hostile, discriminatory, and retaliatory treatment of Mr. Rutherford continued.

39.     Mr. Rutherford noticed that his responsibilities had doubled or tripled compared to his previous responsibilities and that of his white colleagues. For instance, Mr. Rutherford had previously been responsible for one application install environment at a time, with each installation taking anywhere from eight to twelve hours. After Mr. Rutherford complained about racial discrimination, Mr. Yohman routinely gave Mr. Rutherford two or three different application environment installation assignments at the same time. This increased workload was exhausting, often forcing him to work longer hours than his similarly situated non-Black colleagues. When Mr. Rutherford told Mr. Yohman that he was tired during a particularly heavy week, Mr. Yohman ignored Mr. Rutherford and continued to assign him tasks that required his immediate attention. Mr. Yohman did not increase the workload of Mr. Rutherford's similarly situated white colleagues; nor did he ever provide Mr. Rutherford with a legitimate business justification for increasing his workload.

40.     Mr. Rutherford's workload increased in both quantity and difficulty. Mr. Yohman began providing Mr. Rutherford with vague directions and refused to provide the proper guidance and direction for Mr. Rutherford's assignments. Mr. Yohman excluded Mr. Rutherford from conversations directly related to his task assignments. If Mr. Yohman had included Mr. Rutherford

in these conversations, he would have been able to complete his assignments more efficiently. Mr. Yohman did not subject Mr. Rutherford's white colleagues to this treatment.

41.     On March 7, 2017, Mr. Rutherford reported Mr. Yohman again, this time to Kevin Degnan (white), who was the CGI project manager at that time and is now currently CGI's Director of Consulting Services. During a one-on-one meeting, Mr. Degnan informed Mr. Rutherford that Mr. Yohman had complained to Mr. Degnan about Mr. Rutherford's performance and work ethic, claiming that Mr. Rutherford was condescending and upset that he was not made the lead on the project. Mr. Rutherford was shocked to hear this feedback only one week after Mr. Yohman had complimented his performance and communication. Mr. Yohman's statements to Mr. Degnan completely contradicted both his own positive feedback to Mr. Rutherford and also the positive feedback that Mr. Rutherford had regularly received from his colleagues and other supervisors. Mr. Yohman's racist treatment towards Mr. Rutherford was insidious – not only had Mr. Yohman attempted to justify his racist views and conduct, but now, he had fabricated complaints about Mr. Rutherford's performance and attitude in an attempt to damage his career. Mr. Rutherford told Mr. Degnan that Mr. Yohman's claims were inaccurate and informed Mr. Degnan that Mr. Yohman had called him an "NWA."

42.     On March 8, 2017 – just one day after Mr. Rutherford reported Mr. Yohman's racial discrimination to Mr. Degnan – Mr. Yohman yelled at Mr. Rutherford in front of the entire office. Mr. Rutherford was humiliated. Mr. Yohman never yelled at similarly situated white employees.

43.     Then, also on March 8, 2017, Mr. Rutherford met with Greg Turner (white), a Deputy Manager at ASRC, to report Mr. Yohman's racist and hostile behavior once again. Mr. Rutherford informed Mr. Turner about Mr. Yohman's racist conduct, including Mr. Yohman's reference to him as a "NWA." Later that day, Mr. Rutherford also met with Michael Pafumi (white), then ASRC's Program Director and currently ASRC's Vice President of Federal Health

Operations, and Trina Collie (white), ASRC's Human Resources Director. During the meeting with Mr. Pafumi and Ms. Collie, Mr. Rutherford reported Mr. Yohman's racist conduct, including his use of "NWA" and the February 8, 2017, conversation in which Mr. Yohman attempted to justify his racist beliefs.

44.     On March 8, 2017, immediately following the meeting, Mr. Rutherford overheard Mr. Pafumi and Ms. Collie laughing about the meeting and arbitrarily discounting Mr. Rutherford's credibility regarding the statements he relayed about Mr. Yohman's racist conduct. Mr. Rutherford also heard Ms. Collie say that she understood what Mr. Pafumi meant when he rolled his eyes during the meeting. Mr. Pafumi and Ms. Collie were casually laughing about one of the most dehumanizing experiences of Mr. Rutherford's life, mere minutes after he had complained to them about this dehumanizing experience. Mr. Rutherford was devastated.

45.     On March 9, 2017, Mr. Degnan emailed Mr. Rutherford to tell him about a conversation he had had with Mr. Pafumi. Mr. Degnan stated that he had spoken to Mr. Pafumi about the concerns that Mr. Rutherford shared with him on March 7, 2017. Mr. Degnan stated that Mr. Yohman's use of "NWA" was "extremely wrong and unprofessional" and that Mr. Yohman's not allowing Mr. Rutherford to speak at the morning meeting was "condescending and disrespectful." He also said that he and Mr. Pafumi had spoken about Mr. Yohman being removed from Mr. Rutherford's supervisory chain and that Mr. Rutherford and Mr. Yohman should work in separate spaces.

46.     On March 9, 2017, Mr. Rutherford emailed Mr. Pafumi, Ms. Collie, and Mr. Turner to follow up on their meetings and to express his concerns about Mr. Pafumi's and Ms. Collie's laughter and denigrating discussion after their meeting ended. He reiterated how painful and disturbing his experience at ASRC and CGI has been and how difficult it was for him to discuss such a personal and sensitive topic with others. He emphasized that the situation had become very

serious and was not a laughing matter. He reassured them that everything he had told them in their meeting was true and that he hoped they could find a solution.

47.     Unfortunately, Defendants took no remedial action, but instead forced Mr. Rutherford to continue to work in the racially and retaliatory hostile work environment created by Mr. Yohman.

48.     In April 2017—after three to four months of suffering through no remedial action being taken by the Defendants--Mr. Rutherford filed a Charge of Discrimination alleging race discrimination, harassment, and retaliation against ASRC with the Equal Employment Opportunity Commission.

### Defendants Removed Mr. Rutherford From The Contract in Retaliation for His Complaint of Racial Discrimination

49.     On or about May 1, 2017 – immediately after Mr. Rutherford complained about the racial discrimination he was being subjected to and filed an EEOC Charge – CGI Vice President Christina Seiden (white) and CGI Human Resources Deana Brouse (white) notified Mr. Rutherford that he was being removed from the ASRC Contract. Ms. Seiden and Ms. Brouse explained that ASRC had requested his removal. Then, they told Mr. Rutherford that CGI would also terminate his employment unless he found a new position within the next two weeks. After the meeting, Ms. Seiden provided Mr. Rutherford with a written termination letter and confirmation of his two-week deadline.

50.     After being notified of his termination, in May 2017, Mr. Rutherford filed an EEOC Charge of Discrimination against CGI alleging race discrimination, harassment, and retaliation.

51.     On or about May 9, 2017, Mr. Rutherford spoke with Christina Seiden and CGI HR Kelly Jacobs. The pair notified Mr. Rutherford that he had three options moving forward. He could

return to his previous position at ASRC, continue searching for a new position, or accept a three-week severance package.

52.     Mr. Rutherford elected to return to his position with ASRC, hoping that, with the filing of his second EEOC complaint, things would improve for him moving forward. Unfortunately, CGI and ASRC continued to subject Mr. Rutherford to a hostile work environment based on race and retaliation when he returned to work, including excluding him from emails and meetings, which inhibited his ability to perform his job. Defendants' exclusionary treatment of Mr. Rutherford continued until Mr. Yohman was terminated several months later. Mr. Yohman was terminated for reasons unrelated to the complaints which Mr. Rutherford had made regarding his discriminatory treatment.

## CGI Recognized Mr. Yohman's Discriminatory Behavior

53.     On June 1, 2017, Mr. Rutherford emailed Joan Andrew, CGI's Ethics and Compliance Program Manager, and Kevin Fischler (white) to inform them of the discrimination and retaliation he was facing while working on the Contract. During an earlier phone call, Mr. Fischler had told Mr. Rutherford that he was CGI's EEO investigator; but, in reality, Mr. Fischler was CGI's in-house counsel. Mr. Rutherford also informed Ms. Andrew and Mr. Fischler that he had already reported the discrimination and retaliation to his supervisor and human resources.

54.     On June 13, 2017, Ms. Andrew informed Mr. Rutherford that Mr. Fischler would take over an investigation regarding the racial discrimination and retaliation.

55.     On June 19, 2017, Mr. Fischler emailed Mr. Rutherford, stating that he was surprised to learn that Mr. Rutherford had filed a charge with the EEOC.

56.     On July 14, 2017 – less than one month after CGI became aware that Mr. Rutherford had filed an EEOC charge – the internal "investigation" concluded, finding no discrimination or retaliation. Mr. Rutherford requested an update on CGI's internal  investigation

from Mr. Fischler. Mr. Fischler informed Mr. Rutherford that, after fewer than six weeks of investigation, he found no illegal discrimination, no unlawful conduct, and no violation of CGI policy. Mr. Fischler's response was vague, stating that "the entire matter could have been handled better" and that "improvements are warranted."

57.     Because Mr. Fischler stated that the matter "could have been handled better" and "improvements are warranted," CGI was certainly aware that Mr. Rutherford had faced some wrongdoing.

**<u>Conclusion</u>**

58.     In sum, Defendants removed Mr. Rutherford from the Contract in retaliation for his complaining about race discrimination and filing a complaint with the EEOC--after subjecting him to months of race-based discrimination and hostility by his direct supervisor, Mr. Yohman. Even after rescinding the removal, Defendants continued to discriminate and retaliate against Mr. Rutherford by refusing to take any meaningful corrective or remedial action to stop the racial discrimination and retaliation he had been subjected to for several months, including failing to conduct an impartial and thorough investigation into Mr. Rutherford's complaints of racial discrimination and retaliation. In so doing, Defendants continued to subject Mr. Rutherford to a hostile work environment. Mr. Rutherford was and continues to be devastated by his experience at CGI and ASRC.

59.     In August 2018, CGI's contractual agreement with ASRC ended and Mr. Rutherford was removed from the DNC DMIX Contract. On January 31, 2019, Mr. Rutherford filed his third Charge of Discrimination with the EEOC and OHREP against CGI alleging race discrimination and retaliation.

## CAUSES OF ACTION

## COUNT I

### Title VII –Racially Hostile Work Environment
### Against Both Defendants

60.     Plaintiff incorporates by reference paragraphs 29 to 59 as alleged above.

61.     Title VII prohibits the creation of a hostile work environment in employment on the basis of race.

62.     Defendants subjected Plaintiff to a work environment in which unwelcome racist conduct became severe and/or pervasive enough to create an environment that a reasonable person would consider hostile and abusive.

63.     Defendants subjected Plaintiff to a hostile work environment based on his race when his white supervisor referred to him with the most guttural and offensive slur African Americans can be called: "n*gger." Mr. Yohman called Mr. Rutherford a "NWA" meaning "n*gger with attitude." This racist slur, in and of itself, was sufficiently severe to subject Mr. Rutherford to a hostile work environment. *See Ayissi-Etoh v. Fannie Mae,* 712 F.3d 572 (D.C. Cir. 2013).

64.     In the alternative, Defendants subjected Plaintiff to a racially hostile work environment which lasted for months, beginning with Mr. Yohman's referring to Plaintiff with a racial slur ("NWA"), and continuing with his yelling at Plaintiff in a hostile manner in front of other employees, interrupting Plaintiff and speaking on his behalf at meetings, micromanaging Plaintiff's work, fabricating false negative feedback about Plaintiff's work performance, increasing Plaintiff's workload without providing any legitimate business justification for doing so, excluding Plaintiff from work discussions necessary for the performance of his job, and

neglecting to give Plaintiff training or support—all of which were calculated to humiliate Mr. Rutherford and prevent him from being able to effectively perform his job duties.

65.     By engaging in this prolonged and intentional discriminatory and harassing conduct for months, Defendants created a hostile work environment based on Mr. Rutherford's race, in violation of Title VII.

66.     By engaging in this prolonged and intentional discriminatory and harassing conduct for months, Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights.

67.     As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

68.     Plaintiff requests relief as hereinafter described.

## **COUNT II**

### **Title VII – Retaliatory Hostile Work Environment Against Both Defendants**

74.     Plaintiff incorporates by reference paragraphs 29 to 59 as alleged above.

75.     Title VII prohibits retaliation against employees who engage in protected activity in opposition to race-based discrimination in the workplace. A retaliatory hostile work environment exists where the retaliatory conduct: (1) was unwelcome; (2) was sufficiently severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) can be attributed to the employer. *Laurent-Workman v. Wormuth,* No. 21-1766, 2022 WL 17256701, at *10 (E.D.Va. Nov. 29, 2022).

76.     Plaintiff engaged in protected activity by complaining internally of race discrimination and by filing Charges of Discrimination with Equal Employment Opportunity Commission.

77.     Immediately after Mr. Rutherford made his first internal complaint to his team lead in or around January/February 2017, Mr. Yohman's behavior toward Mr. Rutherford worsened significantly. *See* Paragraphs 33-42 *supra*.

78.     In March 2017, immediately after Mr. Rutherford complained to Mr. Pafumi and Ms. Collie about Mr. Yohman's discriminatory behavior toward him, including his referring to Mr. Rutherford as a "NWA," he observed both Mr. Pafumi and Ms. Collie laughing and denigrating his credibility concerning the complaint he made to them about Mr. Yohman. *See* Paragraphs 43-44 *supra*.

79.     Plaintiff complied with CGI's and ASRC's articulated complaint procedures when he complained to his direct supervisors for both entities and Human Resources for both entities.

80.     Immediately after Mr. Rutherford filed the first EEOC Complaint against ASRC in April 2017, CGI informed him that ASRC had requested that he be removed from the contract and he would be terminated. *See* Paragraph 49 *supra*.

81.     After being notified of his termination, Mr. Rutherford filed an EEOC complaint against CGI in May 2017. Shortly thereafter the termination notice was rescinded, and CGI provided Mr. Rutherford with three options, one of which was returning to work.

82.     Mr. Rutherford chose the option to return to work, hopeful that the filing of his EEOC complaints against both CBI and ASRC would improve his working conditions.

83.     Unfortunately, Mr. Rutherford's hopes were dashed, as the discriminatory and retaliatory conduct persisted for several months. *See* Paragraphs 52 through 58, *supra*.

84.     CGI's and ASRC's conduct, as set forth herein, was unwelcome to Mr. Rutherford.

85.     The pernicious conduct of CGI and ASRC in response to Mr. Rutherford's internal complaints of discrimination and his filing of two EEOC complaints in 2017—especially their actions in removing him from the contract in May 2017 just a couple of weeks after he filed an EEOC complaint against ASRC, then returning him to a hostile work environment after he filed an EEOC complaint against CGI--was sufficiently severe or pervasive to dissuade a reasonable person from making or supporting a charge of discrimination.

86.     The actions of Mr. Yohman, Mr. Pafumi (ASRC's Program Director and currently ASRC's Vice President of Federal Health Operations), and Trina Collie (ASRC's Human Resources Director) on behalf of ASRC, and Ms. Seiden (CGI Vice President) and Deana Brouse (CGI Human Resources) on behalf of CGI may be attributed to ASRC and CGI, respectively.

87.     By engaging in this prolonged and intentional retaliatory harassing conduct for months, Defendants created a hostile work environment based on Mr. Rutherford's protected activities, in violation of Title VII.

88.      By engaging in this prolonged and intentional retaliatory harassing conduct for months, Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights.

89.     As a direct and proximate result of Defendants' discriminatory and retaliatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

90.     Plaintiff requests relief as hereinafter described.

## COUNT III

### Title VII – Retaliation
### Against Both Defendants

97.     Plaintiff incorporates by reference paragraphs 29 to 59 as alleged above.

98.     Title VII prohibits retaliation against employees who engage in protected activity in opposition to race-based discrimination in the workplace.

99.     Plaintiff engaged in protected activity by complaining internally of race discrimination and by filing Charges of Discrimination with Equal Employment Opportunity Commission alleging race discrimination.

100.    Plaintiff complied with CGI's and ASRC's articulated complaint procedures when he complained to his direct supervisors for both entities and Human Resources for both entities.

101.    Within a few weeks of Mr. Rutherford's protected activity, CGI informed him that ASRC had requested that he be removed from the contract. *See* Paragraph 49 *supra.*

102.    After being notified of his termination, Mr. Rutherford filed an EEOC complaint against CGI in May 2017. Shortly thereafter the termination notice was rescinded, and CGI provided Mr. Rutherford with three options, one of which was returning to work.

103.    CGI and ASRC removed Mr. Rutherford from the contract in May 2017 because of his protected activity.

104.    Notifying an employee of their immediate termination is a materially adverse action and would dissuade a reasonable person from making or supporting a charge of discrimination or engaging in protected activity.

105.    The actions of Mr. Yohman, Mr. Pafumi (ASRC's Program Director and currently ASRC's Vice President of Federal Health Operations), and Trina Collie (ASRC's Human Resources Director) on behalf of ASRC, and Ms. Seiden (CGI Vice President) and Deana Brouse (CGI Human Resources) on behalf of CGI may be attributed to ASRC and CGI, respectively.

106.    By intentionally retaliating against Plaintiff because he engaged in protected activities, Defendants violated Title VII.

107.     By intentionally retaliating against Plaintiff because he engaged in protected activities, Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights.

108.     As a direct and proximate result of Defendants' discriminatory and retaliatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

109.     Plaintiff requests relief as hereinafter described.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(a)     declaring that the acts and practices complained of herein are violations of Title VII, 42 U.S.C. § 2000e *et seq.*;

(b)     enjoining and permanently restraining these violations;

(c)     directing Defendants to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated;

(d)     directing Defendants to pay Plaintiff compensatory damages for his mental anguish and emotional distress;

(e)     directing Defendants to pay Plaintiff punitive damages;

(f)     awarding Plaintiff pre- and post-judgment interest;

(g)     awarding Plaintiff the costs of this action together with reasonable attorneys' fees; and

(h)     granting such other and further relief as this Court deems necessary and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Respectfully submitted,

*/s/Valerie A. Teachout*
Valerie A. Teachout, Esq. (VSB 70887)
Ivey E. Best (Applicant *pro hac vice*)
THE SPIGGLE LAW FIRM, P.C.
3601 Eisenhower Ave, Suite 425
Alexandria, Virginia 22304
V. Teachout Direct Line (571) 513-6942
Telephone: (202) 449-8527
Facsimile: (202) 517-9179
E-Mail: vteachout@spigglelaw.com
ibest@spigglelaw.com

***Counsel for Plaintiff Lamar Rutherford***

Melissa E. Washington, ESQ. (VSB 97806)
THE WASHINGTON LAW FIRM, PLLC
1050 Connecticut Ave., N.W., Suite 500
Washington, DC 20036
Telephone: (202) 770-3440
E-Mail: mw@washingtonfirmpllc.com

***Co-Counsel for Plaintiff Lamar Rutherford***